## MAUREL v. SMITH et al.

(Circuit Court of Appeals, Second Circuit. January 12, 1921.)

No. 101.

1. **Copyrights ⑳41, 42—Title held in trust for coauthors.**
Complainant, who was the author of the scenario for a comic opera, made a contract with managers for completion and production of the opera, providing that her rights therein should be fully protected. One of the three persons secured pursuant to the contract to write the libretto, lyrics, and music, respectively, obtained a copyright in his name, but which gave the names of those who collaborated in its production. *Held*, that he held the legal title in trust for the benefit of complainant to the extent of her rights reserved by her contract.

2. **Literary property ⑳7—Subject to same law as other personalty.**
An author has the same rights in his work as the owner of other personalty, and may sell the same outright, or dispose of it on such conditions or with such restrictions as he might any other property.

3. **Copyrights ⑳41, 42—Equity has jurisdiction to determine rights of co-owners.**
Equity *held* to have jurisdiction of a suit to determine the respective rights of coauthors of an opera in a copyright therefor taken in the name of one, and in the proceeds of contracts for its production.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by Fred de Gresac Maurel against Harry B. Smith and another, to determine her interest and rights in a certain dramatic and literary property, in the opera "Sweethearts," and declaring the defendants trustees for the plaintiff of the statutory copyrights held by them to the extent of an equal share with each of the defendants, Harry B. Smith and Robert Smith. Decree for plaintiff. Defendants appeal. Affirmed.

For opinion below, see 220 Fed. 195.

Otto Sommerich, of New York City, for appellants.
Nathan Burkan, of New York City, for appellee.

Before WARD, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. [1] The appellee was the author of a scenario which has been the subject of several titles, to wit, "The White Swan," "Princess Tulip," and finally "Sweethearts." In Sep-

tember, 1912, the appellee made a contract with the firm of Werba & Luescher, theatrical managers, whereby she agreed to complete this scenario, then entitled "The White Swan," and to deliver it to the managers on or before October 2, 1912. She accepted, as her collaborator to complete the work and to write the lyrics for the opera, one Harry Blossom, and she granted a performing license to the managers. That contract provided that the managers would advertise the name of the appellee on the programs, printing, and advertising matter as follows: "The White Swan" (or substituted name of the opera); opera, books and lyrics by Fred de Gresac (appellee subsequently married Mr. Maurel) and Harry Blossom; music by Victor Herbert. The contract further stipulated that the appellee did not grant any publishing rights in the opera to the managers, and the managers agreed that no changes, interpolations, additions, or eliminations of any kind should be made in the opera without the appellee's consent in writing.

The scenario was in French, and the appellee read a translation thereof for one of the managers, and submitted a translation of the first act to them. The managers thereupon made a contract with Mr. Blossom for the completion of the libretto and lyrics. Later Mr. Blossom decided that he could not collaborate on this work, and the managers asked the appellee for her consent to have substituted Harry B. Smith. Appellee gave her consent, upon condition, however, that it would not affect her rights under the contract between herself and the firm of managers, and the reservation of the publishing rights was particularly mentioned. Such consent to the substitution of Harry B. Smith was noted in writing at the foot of the contract. The managers thereafter arranged a meeting between the appellee and the appellant Harry B. Smith, and it was then agreed that the two would collaborate, and that such work would be done upon the same terms as agreed upon with Mr. Blossom. The appellee delivered the second act of the manuscript of the scenario to Mr. Smith, in which she indicated her pleasant satisfaction to work with the appellant, and stated she was willing to help in the dialogue, if he was short of time. The appellant Harry B. Smith accepted the second act, but did not communicate with the appellee, either directly or indirectly, but did communicate with the managers, and said he would undertake the work upon condition that his brother, Robert B. Smith, would be permitted to associate with him. The managers telephoned the appellee and obtained her consent, but she stated that such consent was given providing her interest in the contract was not interfered with and remained the same, to which the managers replied:

"Absolutely, there is to be no change concerning yours."

On December 10, 1912, a contract was made between Werba & Luescher and the appellant Harry B. Smith for the development of the scenario and the writing of the lyrics. Under this contract, the firm of Werba & Luescher were obligated to advertise the names of Harry B. Smith and Fred de Gresac (appellee), as the sole and exclusive authors of the book and music of the play, and Robert B. Smith as the sole and exclusive author of the lyrics of the same, on all the billing and

advertising matters used .in advertising the performance of the play. On the 23d of December, 1912, Robert B. Smith entered into a contract with G. Schirmer, Incorporated, for the publication of the lyrics and vocal score of the said opera.· The recital of this agreement referred to—.

" 'Sweethearts,' the book whereof is by Fred de Gresac and Harry B. Smith, and the music by Victor Herbert. The stellar role of which is to be enacted by Miss Christie McDonald, to be produced under the management of Werba & Luescher of New York."

· The appellant Harry ·B. Smith did write the book of the opera, and Robert B. Smith wrote the lyrics. The lyrics that were written with their titles were blended into the book, and were led up to by cues that were written by both appellants. In the development of the opera, the book was amended so as to fit the lyrics into the book with some color of continuance. After the contract between the appellants and the managers was made, the appellants did not, directly or indirectly, communicate with the appellee, nor was she asked to furnish any material for the work.

On March 14, 1913, she did, however, receive a check for $500 as advance royalty under her contract. This check was sent by the managers. With the letter which accompanied the check, she was invited to attend the rehearsals and it was stated that "the dialogue was then getting pretty well set and they would like her opinion." On April 17, 1913, the appellant Harry B. Smith applied for a copyright to the opera. In his application for such coyright, he named as authors of the work, Harry B. Smith, Fred de ·Gresac, and Robert B. Smith. With the application, he sent the completed manuscript of the play, in which were incorporated all lyrics that were composed by himself and by the other appellant. The copyright was issued to Harry B. Smith and contained the following:

"The title of the dramatic composition registered is 'Sweethearts.' Book by Harry B. Smith and Fred de Gresac. Lyrics by Robert B. Smith. Music by Victor Herbert. A comic opera in two acts, book and lyrics."

Thereafter the vocal numbers and the vocal score of the opera were published under the contract between Robert B. Smith and G. Schirmer, Incorporated. The title page of the vocal score contained the following inscription:

" 'Sweethearts.' A comic opera in two acts. Book by Harry B. Smith and Fred de Gresac. Lyrics by Robert B. Smith. Music by Victor Herbert."

The first performance took place in March, 1913, and the play was unusually successful. In October, 1913, an offer was made to place the opera for public performance in New Zealand, Australia, and South Africa. Appellee's consent was asked, and she refused, unless she received 25 per cent. of the proceeds of the performances. This demand was acquiesced in by the appellants. They, however, state the reason for their acquiescence was that they did not have a copyright in Australia. Under an agreement of October 3, 1913, entered into between Victor Herbert, Fred de Gresac, the appellants, and the J. C. Williamson, Limited, exclusive performing rights of the opera in Australia, New

Zealand, and South Africa were granted, payment to be made 50 per cent. to Victor Herbert, 25 per cent. to Fred de Gresac, and 25 per cent. to the appellants. That contract, in its recitals, referred to the appellee as one of the authors of the opera. The evidence shows that the appellant Harry B. Smith had previously collaborated with appellee on six comic operas, and the contracts made in respect to these collaborations were upon the basis of equal co-owners, and that Smith was to copyright the joint work, but hold such copyright in trust for the appellee to the extent of her rights. When the appellee demanded her share of the publishing royalties paid by G. Schirmer, Incorporated, from the appellants, they denied that she had any right whatever in the play, and have since maintained this position.

· In view of the evidence, it is clear to us that the work of completing the book and writing the lyrics of the opera "Sweethearts" was undertaken, not only with the consent of the appellee, but under an agreement by which she was to share in the profits obtainable from the sale of the book of the opera and in its dramatization and musical production.

When the firm of Werba & Luescher interested appellant Harry B. Smith, and asked for his substitution in the place of Mr. Blossom, the scenario was accepted by such managers upon which to complete the book of opera now known under the title of "Sweethearts." What took place thereafter through the efforts of the appellants and also Victor Herbert was a confusion of literary labor contributed by independent efforts. The appellee furnished the scenario, the appellants Smith the libretto and lyrics, and Victor Herbert the music. The appellee protected her rights and imposed the conditions or restrictions as to the extent of the use of her scenario, and thus protected her rights, and property, which she had acquired in the finished product. Such rights seem to have been respected by the appellants in the publication of the book of the opera, in the application for and the grant of copyright, and, indeed, in every stage up to the time of payment of the royalties.

[2] The rights of property which the appellee had were transferable by sale and delivery, and there is no distinction, independent of statute, between literary property and property of any other description. The right to sell and transfer personal property is an inseparable incident of the property. An author or proprietor of a literary work or manuscript possesses such a right of sale as fully and to the same extent as does the owner of any other piece of personal property. It is an incident of ownership. Therefore sales may be absolute or conditional, and they may be with or without qualifications or restrictions, and the law relating to personal property is applied in determining the character of a sale of literary property. Parton v. Prang, 3 Cliff. 537, Fed. Cas. No. 10,784. The managers and the parties recognized this property right flowing from the collaboration of labor. It was agreed to advertise the name of the appellee, and no changes or eliminations of any kind were to be made in the opera without her consent, nor were any rights to be granted by the managers without her consent, and the appellants consented to use the scenario of the appellee and to

labor with reference to it. Thus was mingled the labor of the appellants and the appellee. In the contract which the appellants made with the managers, Werba & Luescher, and in the grant of the rights for other countries, they recognized the appellee's work. Therefore, when the appellants granted rights to G. Schirmer, Incorporated, they could but transmit what they had to part with, and they could not transfer what interest the appellee had. Fairbanks v. Sargent, 117 N. Y. 333, 22 N. E. 1039, 6 L. R. A. 475.

Indeed, the very contract between the appellant Robert B. Smith and G. Schirmer, Incorporated, recognized the appellee as the coauthor of "Sweethearts," and in the application for a copyright Harry B. Smith did the same. The result is that there was a joint co-operation in carrying out the effort to complete the opera. It is not essential that the execution of the work should be equally divided; as long as the general design and structure was agreed upon, the parties may divide their parts and work separately.

"The pith of joint authorship consists in co-operation, in a common design, and whether this co-operation takes place subsequent to the formation of the design by the one, and is varied in conformity with the suggestions and views of the other, it has equally the effect of creating the joint authorship as if the original design had been their joint conception." Coppinger, Law of Copyrights (4th Ed.) pp. 109, 110.

In Dam v. Kirk La Shelle Co., 175 Fed. 902, 99 C. C. A. 392, 41 L. R. A. (N. S.) 1002, 20 Ann. Cas. 1173, in an action for infringement of copyright, this court recognized the obligation to protect one who prepared the framework of a play and said:

"The story was but a framework, * * * but the right given to an author to dramatize his work includes the right to adapt it for representation upon the stage, which must necessarily involve changes, additions, and omissions. It is impossible to make a play out of a story—to represent a narrative by dialogue and action—without making changes, and a playwright who appropriates the theme of another's story cannot, in our opinion, escape the charge of infringement by adding to or slightly varying his incidents."

We conclude that the rights which the appellants had in the use of the scenario were only such as were permitted pursuant to the agreement of the parties to collaborate to produce the opera "Sweethearts." Therefore, as between the appellee and the appellants, who are coauthors and jointly interested with the appellants in the work when the play was copyrightd by the appellant Harry B. Smith, the copyright is deemed to have been taken out in the name of one as a trustee for all the true owners. The consent to take out the copyright in the name of one does not destroy the interest of the others, who have jointly labored with the applicant for such coprighted play. The legal title to a copyright thus obtained vests in the person in whose name the copyright is taken out. The question of such ownership is dependent upon the circumstances of the case. T. B. Harms & Francis, Day & Hunter v. Stern, 229 Fed. 42, 145 C. C. A. 2; Press Pub. Co. v. Falk (C. C.) 59 Fed. 324; Black v. H. G. Allen Co. (C. C.) 42 Fed. 618, 9 L. R. A. 433. Here the joint owners of the work are represented by Harry B.

Smith, so far as the record title of the copyright is concerned; but he holds it as such trustee.

[3] But it is contended that the relief granted by the decree below is at variance with the allegations of the bill of complaint. We find no variance between the complaint and the proofs which justify the claim. Lockhart v. Leeds, 195 U. S. 427, 25 Sup. Ct. 76, 49 L. Ed. 263; N. P. Pratt Lab. Co. v. Buffalo Forge Co., 184 Fed. 287, 106 C. C. A. 429. The action was properly maintainable in equity. The action is brought to secure an adjudication that the copyrights taken up by the appellant Harry B. Smith are held in trust for the appellee— at least to the extent of her rights as co-owner. Where two or more persons have a common interest in a property, equity will not allow one to appropriate it exclusively to himself, or to impair its worth as to others. The settlement of rights between joint tenants or joint owners of property is the subject-matter of equity jurisdiction, and we think that such rights are involved in this litigation. Jackson v. Ludeling, 21 Wall. 616, 22 L. Ed. 492.

In determining the interest of the appellee, the court below awarded the appellee an interest of one-third and the Smiths one-third each in whatever rights the Smiths had in the copyrights under any agreements with G. Schirmer, Incorporated, or Victor Herbert, the composer. It declared the appellee a co-owner to the extent of one-third interest with the Smiths in any interest which all three of them may have had in moving picture rights of the opera, in any other territory, not copyrighted, which has not passed to Werba & Luescher under the appellee's contract with them, and, further, it decreed an accounting against Robert B. Smith of any profits which he may have received from the statutory copyrights. It held that in the account any proper cross-equities may be considered. We think this declaration of the interest of the appellee was proper.

The decree is affirmed.