Heidi S. WEISSMANN, M.D., Plaintiff,

v.

Leonard M. FREEMAN, M.D., Defendant.

No. 87 Civ. 6069 (MP).

United States District Court, S.D. New York.

May 3, 1988.

As Amended May 6, 1988.

---

Vladeck, Waldman, Elias & Englehard, P.C., New York City by Judith P. Vladeck, Julian R. Birnbaum, Jill R. Roisen, for plaintiff.

Summit, Rovins & Feldesman, New York City by Guy R. Fairstein, for defendant.

## DECISION AND OPINION

MILTON POLLACK, Senior District Judge.

In an uncommon controversy, the issues presented are whether a medical paper represents joint or individual authorship and whether it may ground an infringement claim under the Copyright Act, 17 U.S.C. § 101, et seq. The action was tried to the Court at a Bench trial.

The parties are both nuclear medicine physicians. The plaintiff, Heidi S. Weissmann, M.D. ("Weissmann") charges infringement by the defendant, Leonard M. Freeman, M.D. ("Freeman"), of a syllabus entitled "Hepatobiliary Imaging" which she presented at a nuclear medicine refresher course sponsored by the Radiological Society of North America ("RSNA") in 1985. A booklet containing the syllabus compiled the papers submitted by the physicians lecturing at the RSNA course and was copyrighted by RSNA.

Two years later, Freeman planned to utilize a copy of the same syllabus at a nuclear medicine review course ("the review course"), where he was to be the lecturer at a seminar scheduled for August 24–27, 1987, at the Mount Sinai School of Medicine ("Mount Sinai"). Only two changes were made in the syllabus: 1) plaintiff's name, which appeared at the upper right corner of alternate pages in the 1985 syllabus, was deleted from the Mount Sinai 1987 review course syllabus and replaced with defendant's name; and 2) the title "Hepatobiliary Imaging," used on the earlier syllabus, was changed in the 1987 syllabus to "Gastrointestinal Nuclear Medicine Hepatobiliary Imaging".[1]

Prior to the date for the Mount Sinai review course, plaintiff obtained a copy of the syllabus which was to be handed out to the attendees. On August 19, 1987, she inquired from RSNA whether it had given permission for the use described above. The RSNA told plaintiff that no permission had been sought by anyone for such use.

Plaintiff thereupon requested the director of the review course not to circulate the syllabus and to inform all recipients that she claimed sole authorship thereof. The administrator at Mount Sinai was similarly advised. It was quickly decided that the material would be removed from all copies of the review course handouts and the nine copies already distributed to employees were retrieved. Freeman had no objection to the removal of the disputed material from the lecture hand-outs and went on with the review course lecture without it.

Nonetheless, on the next day, August 20, 1987, this suit was filed, alleging copyright infringement in violation of 17 U.S.C. § 501 and seeking a preliminary injunction. In her prayer for relief, plaintiff sought: a declaration that Freeman had committed actionable infringement; an order permanently restraining him from infringement; an award of actual damages and profits; and full costs and attorneys' fees.

Plaintiff then amended the complaint to seek, in addition to declaratory and injunctive relief, damages only with respect to defendant's economic gain from the alleged infringement and statutory costs and attorney's fees. The claim for attorneys' fees was dismissed at the close of plaintiff's

---

1. This work describes a technique involving the injection of radioactive isotopes into the blood, their uptake in the liver and their subsequent secretion in the bile. The areas outlined by the injected substance are then photographed to permit the diagnosis of liver and biliary disorders.

case, with plaintiff's consent, because the copyright was not registered before this suit was commenced and registration is a statutory prerequisite to such a claim. 17 U.S.C. § 412.[2] Jurisdiction herein is based upon 28 U.S.C. § 1338(a) and 17 U.S.C. § 501(b).

Several months after inception of this suit, plaintiff obtained a registration of a copyright in her name covering the same syllabus she had used in 1985 at RSNA. The registration was issued to her on November 9, 1987 and states her contention to the Register of Copyrights that the copyrightable material in the syllabus consists of "amplification, revision and reorganization of pre-existing material; review and update of relevant literature to add new references; substantial new textual material and compilation of photographs." Plaintiff relies on the registration issued to her as well as the registration of the RSNA booklet.

Defendant denied liability for infringement and asserts that the syllabus was the product of lengthy collaborative research and joint authorship, largely copied verbatim from earlier papers created either solely by him or in whole or in part in his role as principal investigator, collaborator, writer and chief of the nuclear medicine department in which plaintiff was employed; that he was entitled to use the paper as stemming from his own contribution to the syllabus, for lecture, teaching and study purposes; that it was a fair use; and that the content was in the public domain. Further, in his Answer, defendant seeks 1) a declaration that he and plaintiff are joint authors of the allegedly infringed work, 2) a dismissal of the amended complaint and 3) costs and a reasonable attorney's fee.

## I. *Background*

To place the dispute in focus, it is necessary to consider: the origin and development of the syllabus in light of the parties' relationship, the stature of the defendant in the medical profession and in the field of nuclear medicine in particular, the development of the plaintiff's career in the field under defendant's supervision, guidance and control as defendant's junior associate, and the parties' use of radioactive substances on humans in imaging of the gall bladder and liver under authorizations issued to defendant alone.

From the inception of the parties' professional association in 1977 to plaintiff's termination in 1987, defendant was the Chief of the Division of Nuclear Medicine at Montefiore Medical Center ("Montefiore") and plaintiff, starting as a fourth-year radiology resident under defendant, was the developing junior member of the association. Their work was laid down in papers, syllabi and articles, in evolutionary stages, jointly conceived and executed. Each had a hand in propelling that evolution. To a large extent it was plaintiff's part of the joint enterprise to write down the results of their activity, with defendant always on top of what was in progress, by actually supervising the investigations, writing portions of papers, reviewing drafts, commenting on the scripts and lending credibility thereto and to the project by his standing, reputation, knowledge, perception, and experience.

The item presently under consideration ultimately evolved in that manner. The

---

**2.** Copyright registration is a prerequisite to the filing of an infringement suit. 17 U.S.C. § 411. Plaintiff herein commenced this action by filing a complaint on August 20, 1987. Plaintiff's copyright registration is dated November 9, 1987; thus, she was technically not entitled to have instituted this action at the time. Plaintiff amended the complaint nunc pro tunc, however, to allege registration of the copyright. The parties agreed to the amendment of the complaint by stipulation dated March 8, 1988. Plaintiff was thus entitled to maintain this action. *See Conan Properties, Inc. v. Mattel, Inc.,* 601 F.Supp. 1179, 1182 (S.D.N.Y.1984) (a defect

"can be cured simply by filing a second amended complaint, which relates back to the commencement of the action, and which includes a recitation that the registration requirement has been satisfied"); *Frankel v. Stein and Day, Inc.,* 470 F.Supp. 209, 212–13 n. 2 (S.D.N.Y.1979) (permitting amendment of the complaint, especially in light of the fact that the defendant did not object to this), *aff'd,* 646 F.2d 560 (2d Cir. 1980); *Eden Toys, Inc. v. Florelee Undergarment Co.* 697 F.2d 27, 33 (2d Cir.1982) (permitting amendment of the complaint even though plaintiff apparently did not register the copyright until after defendant's alleged infringement).

writing at issue here was no more than a stock piece of what the parties had already worked up, nothing new or newly communicated, merely freshened up to take in evolutionary detail on what had already been compiled; it did not report any new studies.

In those circumstances, in August 1987, when invited to speak at a review course at Mount Sinai, the defendant felt comfortable in planning to hand out the syllabus at the course. He placed his name on the hand-out rather than plaintiff's, since she was not scheduled to give any part of the review lecture on that occasion. Plaintiff's sensitivity to this conduct, which to her was a seeming by-pass of her participation in the work, galvanized this suit, with its highly emotional overtones and accusatory concepts. Suffice it to say the piece was not used by the defendant and he delivered the lecture without a syllabus hand-out.

## II. *In More Detail*

### A. *The Parties*

#### 1. The Defendant—Freeman

In the order of seniority, we discuss the defendant first—the Chief of the Department of Nuclear Medicine at Montefiore. Freeman is Board Certified in Radiology, Nuclear Medicine and Diagnostic Radiology, with special competence in Nuclear Radiology. He is a professor of Radiology and of Nuclear Medicine at the Albert Einstein College of Medicine ("Einstein"), where he has held faculty appointments since July 1964, is an attending physician in Radiology and Nuclear Medicine at Montefiore and also serves as Director of the Nuclear Medicine Service at Montefiore and Vice–Chairman of the Department of Nuclear Medicine at Einstein.

Freeman was President of the Society of Nuclear Medicine in 1979–80, President–Elect of the Society in 1978–79 and its Vice–President in 1977–78. He holds editorships in specialty publications: co-editor of "The Seminars in Nuclear Medicine," now in its 18th volume; co-editor of "Nuclear Medicine Annual"; co-editorial consultant of the *Physicians' Desk Reference for Radiology and Nuclear Medicine;* medical

editor of "Current Concepts in Diagnostic Nuclear Medicine"; and editor of a textbook called *Freeman and Johnson's Radionuclide Imaging.* Freeman is well-published in diverse areas of nuclear imaging, including hepatic (liver), renal (kidney), and bone imaging, especially using Rose–Bengal, the forerunner of the radioactive material referred to as the IDA compounds. It is evident from Freeman's curriculum vitae and list of major presentations that Freeman is a prolific author on a broad range of organ systems susceptible of diagnosis by radionuclide imaging, a much sought-after speaker at national and international meetings and before professional societies and medical institutions and an esteemed physician and researcher in the field of nuclear medicine and radiology.

#### 2. The Plaintiff—Weissmann

Plaintiff is a graduate of Mount Sinai School of Medicine and licensed to practice medicine in the State of New York. At the time plaintiff commenced this action, she held appointments as an associate professor of Nuclear Medicine and Radiology at Einstein and as an attending physician employed by Montefiore.

Weissmann began her professional association with the defendant in the fourth year of her residency in radiology at Montefiore in July 1977. Weissmann spent the following year at New York Hospital–Cornell Medical Center for a fellowship in ultrasound and in July 1979 returned to Montefiore as an adjunct attending physician and to Einstein as an instructor in Radiology. Although Weissmann's specialties are Nuclear Medicine and Radiology, she is not Board Certified in either. She has taken only the written portion of the certification examination.

In 1979, Weissmann received the President's Award of the American Roentgen Ray Society for a paper of which she was the first-named of four authors. Weissmann was honored in 1980 as a recipient of the Distinguished Alumnus Award of the Mount Sinai School of Medicine. In 1982, she received the Tetelman Award of the Society of Nuclear Medicine, awarded an-

nually to an outstanding investigator in the field of nuclear medicine under thirty-five years of age. Her curriculum vitae lists as published, or in press, 34 journal articles, 33 abstracts, and nine book chapters, of which Weissmann is author or co-author. Virtually all of her published works relate to radionuclide imaging of the biliary tract. Weissmann has been enthusiastically received at numerous meetings where she lectured on the subject and her expertise has been recognized.

B. *The Radiopharmaceutical "IDA"*

From 1966 to 1973, Freeman published in the areas of hepatobiliary problems. In the latter part of 1976 and early 1977, he became involved with the application of derivatives of a radionuclide, iminodiacetic acid ("IDA"), a substance labelled with the isotope technetium and injected into the blood so that it can be picked up by the liver and simulate the flow of bile, allowing diagnosis of liver and biliary disorders. Merck–Frosst, the Canadian manufacturer of an IDA analog known as HIDA, was interested in obtaining American investigators with the appropriate tools, laboratories and reputations in order to develop a patient data base to support the company's application for approval from the Food and Drug Administration ("FDA") to distribute the pharmaceutical in the United States. The company acquired an investigational new drug ("IND") authorization from the FDA and contracted with five physicians, of which Freeman was one, to conduct studies using this new substance. That was the project on which plaintiff served under defendant for several years since 1977. In the past three to four years, scientists have almost exhausted their investigations of this agent, and most researchers who have been involved in this area have moved to other areas of interest.

In addition to the required authorization (IND) from the FDA, very specific approval to perform studies with this agent had to be obtained from two committees at Montefiore: (i) the Institutional Review Board and (ii) the Committee for Human Isotope Usage, which dealt with the administration of radioactive material to human beings.

The principal investigator identified and authorized by the FDA and the Montefiore committees with regard to the IDA agent was Freeman. Because of the FDA and Montefiore approvals granted in his name, Freeman was an essential element in all IDA work done at Montefiore, at least until 1982 when one agent was licensed by the FDA for use other than on an experimental basis. The FDA authorized Freeman's use of the IDA analog initially under the Merck–Frosst IND authorization and thereafter under his own IND. Freeman was subsequently authorized by the FDA to use other IDA derivatives, including agents manufactured by New England Nuclear Corporation and Squibb.

Later, Weissmann was authorized to use one particular IDA analog, that manufactured by Amersham Corporation. However, even that analog was used under the Montefiore approvals given to Freeman.

In addition, Montefiore approved an informed consent form, to be signed by patients before being subject to IDA use; the form ran in favor of "Dr. L. Freeman and associates."

Freeman's role as principal investigator with respect to the IDA analogs meant, in Weissmann's own words, that the "buck stops" with Freeman. Articles jointly published in both Freeman's and Weissmann's names based on 90– and 323–patient studies included patients whose case histories were reported back to the pharmaceutical houses with respect to whose IDA agents Freeman was the principal investigator.

The investigations using IDA derivatives at Montefiore were initiated due to Freeman's reputation in the field of nuclear imaging. He possessed the IND authorizations and the Montefiore approvals to administer the drug, and the patients, who signed informed consent forms bearing Freeman's name, were referred to the department over which he presided and for which he was ultimately responsible.

C. *The Evolution of Plaintiff's Exhibit 1 ("P-1")*

The parties began collaborating on and pursuing a common design of investigating

the use of IDA derivatives while Weissmann was a fourth-year resident. They published their first jointly authored article concerning IDA scanning, or scintigraphy, in January 1979. A series of journal articles followed over the next several years on the use of IDA scanning in diagnosing biliary diseases, published in the names of Weissmann, Freeman and other investigators.

The allegedly infringed syllabus ("P–1") originated as a result of this collaboration between the plaintiff and the defendant. The work in which plaintiff claims a copyright is a syllabus—a review paper providing an overview of the potential and of the current state of the art of specific research being done in the particular field, in this case hepatobiliary imaging techniques. Syllabi are papers that accompany lectures and are distributed to attendees of refresher courses and other educational meetings. Medical residents, for example, use such review course syllabi to study for specialty boards. As opposed to journal articles, a syllabus usually does not report original research.

Beginning in about April 1980, Freeman and Weissmann together prepared a syllabus to submit to the sponsors of refresher courses at various medical centers.

Plaintiff testified, in substance, that from the very beginning when she started as a resident, Dr. Freeman had made it clear to her that there are different kinds of articles that "we" write; as to journal articles, for example, plaintiff said that it was clear Freeman expected his name to be added to them when done and submitted by any physician in his division. Plaintiff acquiesced in that procedure; she testified that "he was responsible for what I was saying, but I really was doing the primary research."

Weissmann and Freeman spent their professional association in offices in close proximity to each other, with frequent consultations between them throughout the day. She "would get input from him as to his opinions and directions, based on his experience. Mentioning his name lent authority" to what the plaintiff was doing.

Plaintiff did all of her writing pertinent to this lawsuit while she was affiliated with Montefiore in defendant's department. Of the writings that are reported in her curriculum vitae, and those that are not, plaintiff did almost all of the writing, but she submitted drafts to Dr. Freeman before publication. She would always make sure to leave a copy of a manuscript on his desk if he was not in town or busy with other commitments; she did not always get comments back, but often she did. Taking the list of articles on her curriculum vitae, plaintiff testified that Dr. Freeman was co-author on not all but most of the articles.

The plaintiff admitted that her activity with Freeman involving IDA biliary imaging agents was collaborative on some occasions. It was pointed out to her that in her vitae, 30 of the 34 journal articles appear in the names of Freeman and Weissmann, either together or with others, 32 of the 33 abstracts bear her name and Freeman's, either together or with others, and 5 of the 9 book chapters identify Weissmann and Freeman as co-authors together or with others. Plaintiff admitted that there was no peer-reviewed paper or abstract of which the plaintiff was the author or co-author that is not listed in her vitae. Significantly, there is no review course syllabus listed in her vitae.

P–1 is a 1985 update of a continually evolving stock piece of a syllabus used by the parties and continuously styled in the same general format to accompany many of their review course lectures commencing in April 1980; as indicated previously, exhibit P–1 did not report anything of substance that was new in the field.

The stock piece was first prepared for use at a forthcoming April 1980 nuclear medicine review course sponsored by Harvard Medical School. Freeman testified that it was he who was invited to lecture on hepatobiliary imaging at this review course, and he secured an invitation for Weissmann to participate with him. Although Weissmann initially claimed to have had a direct invitation to lecture at Harvard in 1980, Weissmann later conceded

that she might have been invited to participate as lecturer through Freeman and could not really remember. Freeman's testimony gives the more believable version. Weissmann and Freeman jointly prepared the syllabus to be handed out at the 1980 Harvard course. Attached as the first annex to the Harvard 1980 course syllabus is a 1979 paper in which Freeman's input was an integral part. Weissmann relied quite heavily upon Freeman to put a manuscript together and teach her how to construct a paper compiling the data that had been gathered.

A few weeks prior to the lecture at the Harvard 1980 review course, a nuclear medicine review course was conducted at Einstein at which Weissmann lectured and for which plaintiff submitted a syllabus by-lined in her name alone. Freeman credibly testified that Weissmann did not have a syllabus ready for submission to that Einstein course as the submission deadline approached, so Freeman suggested that she look at the syllabus they together had already prepared for the Harvard course, which had an earlier submission deadline, and make minor revisions to it. The Einstein 1980 review course paper was actually prepared after the paper for the Harvard 1980 review course.

The Einstein 1980 paper is virtually identical with the Harvard 1980 paper of which Freeman was a co-author; there are minor changes in word order and two or three additional sentences in the Einstein syllabus. Freeman was co-author of the Einstein 1980 paper as well. Freeman was a co-director of the Einstein 1980 review course and Weissmann necessarily acted under Freeman's aegis when she submitted the paper there under her name alone. This is some indication of a practice that, rather than designating the authorship, the by-line name appearing on such review course material was utilized as an identification of the reviewer or lecturer who was to appear before the audience.

The standard piece continued to be used by the parties as review course syllabi in succeeding years. Not all subsequent versions of the paper were received in evidence, but the Court did receive the paper as submitted for the following nuclear medicine review courses: Harvard 1982, Einstein 1983, Harvard 1984 and Mount Sinai 1984. There are minor variations in the syllabi preceding the 1984 papers. The Harvard 1982 syllabus uses figures, which appear in the Einstein 1983 syllabus also. The main thrust of the Harvard 1984 syllabus, which is by-lined with Freeman's name alone, is a new section on so-called "false positive" studies composed by Freeman alone. That paper omits several other sections previously used and appears to be a somewhat abbreviated hand-out. The Mount Sinai 1984 syllabus, which lists Weissmann in the byline, contains all sections used in prior versions of the paper including the new false positive section but omits figures. The latter two syllabi are in a slightly different format than their predecessors.

Substantial portions of P-1 were taken verbatim from prior review course syllabi and other jointly authored works of the parties. The Einstein 1983 and Mount Sinai 1984 review course papers are copied virtually verbatim almost in their entirety in P-1. The "Chronic Cholecystitis" and "Cholestasis" sections of P-1 are in fact taken virtually verbatim from both the Harvard 1980 paper and the parties' jointly authored chapter in a book edited by one, Serafini. Neither of the parties felt it necessary to obtain permission for such use from the publisher-copyright holder of the Serafini book before submitting the educational paper P-1 to the RSNA.

In describing the recommended technique of administering the radiopharmaceutical, P-1 expressly attributes the recommendation to "we," *i.e.,* clearly a reference to Weissmann and to her collaborator. Weissmann was not alone in creating this work or its predecessors, but received the active participation of her mentor and colleague in what was a collaborative effort to research and report the state of the art in hepatobiliary imaging.

D. *Joint Authorship*

The parties had agreed, at least impliedly if not overtly, that the stock piece could be

used as a handout by either of them, in their individual or joint names, to accompany the teaching review course lecture in which the individual was the assigned lecturer.

Weissmann and Freeman unquestionably were collaborators in their investigation of the various IDA analogs they used at Montefiore and joint authors of the syllabi and of many of their journal articles, abstracts and book chapters concerning hepatobiliary scintigraphy using technetium-labelled IDA analogs.

Freeman's participation is strikingly illustrated by inclusion in P-1 of the section entitled "False–Positive Studies for Acute Cholecystitis," which unquestionably he composed. His authorship thereof was unequivocally established at the trial. In May 1983, Freeman had been invited to speak at Harvard's review course to be held the following year. Several articles had begun to appear in the literature criticizing the use of IDA imaging procedures and reporting "false positive" results in studies using these procedures. A "false positive" occurs when a test result indicates that a patient has a particular condition (acute cholecystitis) but is later found in fact not to have that condition. In accepting the invitation to speak at Harvard in 1984, Freeman told the sponsors of the course that he would address the issue of IDA scanning, its interrelationship with other imaging procedures and the reported false positive results.

Freeman had already planned to address that topic of reported false positives, or hepatobiliary "pitfalls," at a presentation to be given in October 1983 at Case Western Reserve School of Medicine to the Cleveland Radiological Society. Freeman wrote his choice of a lecture topic in a letter dated February 24, 1983 to a Dr. LiPuma at Case Western. Freeman prepared a set of "false positive" slides, representing the most current state of hepatobiliary scintigraphy, as an accompaniment to the Cleveland lecture, to be given in October 1983. He further testified that he kept two copies of those slides and gave one copy to Weissmann for her use.

Freeman had a long-standing interest in false positive studies, illustrated by his February 24, 1983 letter referring to "pitfalls" and his letter to a Dr. Berk dated September 6, 1983 on that very subject. The compelling proof of his having prepared the "false positive" slides was buttressed by his use of them on October 18, 1983 at the New York Hilton, even before the Cleveland lecture, portrayed in a videotaped debate with Dr. Laing, produced in evidence as Defendant's Exhibit 48. A review of the videotape of Freeman's performance at the Freeman/Laing debate substantiates even further a finding that it was Freeman who was actively involved in the creation of these slides.

Subsequently, with Freeman's lecture at the 1984 Harvard review course approaching, Freeman authored as an accompaniment to his appearance a submission for the course which discussed the reported false positive IDA studies, incorporating material from the slides he had used in Cleveland. Freeman individually was the author of the "false positive" matter contained in the Harvard 1984 syllabus, which was submitted with Freeman's name alone for his lecture there.

Weissmann also spoke on the subject of reported false positives, using slides; however, the earliest such occasion was in November 1983, subsequent to Freeman's lecture in Cleveland. Weissmann had no response to the graphic evidence in defendant's Exhibit 48 and failed to contradict with credible evidence the conclusive proof in favor of defendant's claim of authorship of the slides used and of the lengthy section in P-1 of the false positive discussion.

Indicating the mutual use of the collaborative efforts, Weissmann lectured at the Mount Sinai nuclear medicine review course in 1984, and in connection with the lecture she submitted a hand-out entitled "Hepatobiliary Imaging." Although this paper by-lined only her own name, it incorporated Freeman's "false positive" section verbatim from the Harvard 1984 paper as well as all of the other sections created earlier by the collaborative effort and used in the syllabi for prior review courses.

### E. *New Matter*

■ Plaintiff contends that the questioned article contains new matter and non-trivial originality; that it has variations which are sufficient to render it meaningfully distinguishable from the prior forms of the work from which it was drawn. It is not the proper function of this Court to consider whether the alleged new work is a qualitative improvement over the prior work in determining the scope of copyright protection. 1 Nimmer on Copyright § 3.03 at 3–10 [hereinafter "Nimmer"]. "It would be a dangerous undertaking" for the Court to constitute itself the final judge of the "worth" of the work. *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 251, 23 S.Ct. 298, 300, 47 L.Ed. 460 (1903). The Court addresses originality, not novelty. *L. Batlin & Son v. Snyder,* 536 F.2d 486, 490 (2d Cir.), *cert. denied,* 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976). However, the Court was provided with the best qualified expert opinion on the appearance or absence of new matter and of non-trivial originality, that of the defendant, the acknowledged outstanding expert in the field. The plaintiff merely echoed legal language found in the reported cases in asserting that she had presented some new and additional expression in P–1. P–1 was portrayed by the plaintiff as the product of a month's effort and the review of more than 100 works in the literature. However, only four new references were added: two citing the illustrations reproduced with permission, both of which were originally prepared by Freeman, one citing to a work jointly authored by the parties, and one citing to a work that reported a procedure disfavored by the parties.

The defendant testified that there was nothing new expressed. Only trivial variations were stated in P–1, adding nothing, and the paper was only the old stock piece updated. Certainly there was nothing sufficiently substantial in its originality to merit protection under the Copyright Act. Significantly, by 1985, interest in IDA had already peaked: "most of everything that has had to be done with this agent has become established and most investigators who have been involved in this area have moved on to other areas." P–1 was just the "most recent version of the piece that Dr. Weissmann and [Dr. Freeman] had been using since 1980 with various minor revisions and update and cutting and pasting that had been done in its use over a seven-year period."

■ No corroboration from any independent qualified source was supplied by the plaintiff for her contrary assertions. After defendant's convincing rebuttal of the presumption of originality of the allegedly infringed work, the plaintiff then had the burden of going forward on the issue; that she failed to do. The matter was not self-proving.

### F. *Mount Sinai 1987*

Weissmann was on sabbatical leave from her employment at Montefiore in 1987. Freeman was invited in that year to lecture at a review or teaching course at Mount Sinai. Freeman instructed his secretary to prepare P–1 for use in the 1987 Mount Sinai review course, to place his name on the handout syllabus in place of Weissman's name used on the 1985 RSNA handout and expand the title by adding three words. Freeman justified this "copying" with the belief that he was using the jointly prepared stock piece for a syllabus handout at an educational review course lecture which he alone was scheduled to give.

Fifty copies of the 1987 review course syllabus were run off; nine copies were distributed to Mount Sinai staff physicians; all of these were retrieved and not used. Plaintiff, learning of the lecture and of the proposed handout, protested the omission of her name through counsel. Plainly, to raise a legal question of that kind at the last moment before the lecture was necessarily to disrupt the arrangements for the lecture. To avoid controversy with plaintiff at that moment, Freeman promptly directed the withdrawal of the proposed syllabus and proceeded to lecture without a syllabus handout. The only extant copy of the course booklet containing the form in which Weissmann's name was omitted was

the copy that came into the possession of Weissmann.

### G. *Credibility*

■ On the many issues to be resolved in determining this action, the testimony of the parties was squarely in contradiction. These issues include: the extent to which Freeman had participated in the investigation of IDA as a diagnostic tool; the extent to which Freeman had participated in the preparation of papers and other works published in the names of both parties, as co-authors, on the subject of hepatobiliary imaging; the preparation and content of the various review course syllabi and the modifications from time to time thereof as well as the repetition of the content prior to Weissmann's submission of the paper allegedly infringed; whether Freeman's name appeared on these numerous prior publications because he, as Weissmann's "chief" and mentor, had requested that he be listed as an author even though he had not contributed to the work, or, because he had in fact collaborated as an author; and whether Weissmann had ever previously exacted from Freeman any conditions upon his use of "her" work. These and other controverted matters were raised and considered.

Shortly before the end of the trial the Court asked the plaintiff directly whether she claimed that defendant had any participation at all in the content of the syllabus. The colloquy was as follows:

Q: Is there anything recited in plaintiff's Exhibit 1 which were the words and work of Dr. Freeman on a prior occasion?

A: None at all. This is my words, my work, my expression. Dr. Freeman had no participation in it.

Q: Are there sections, paragraphs, sentences in there, which were the words and work of Freeman on a prior occasion?

A: Not a single word.

The physical evidence and the credible testimonial proof were all to the contrary of those flat denials.

The Court had the opportunity, during the four days of trial, to consider the proofs and observe the demeanor of the parties as witnesses. Based upon the parties' testimony and demeanor, illumined by the documentary evidence and the testimony of non-party witnesses, the Court resolves the issues of credibility in favor of defendant and against the plaintiff. At the point of the trial when the slides dealing with the false positive issue were demonstrated, the Court was expressly constrained to find on the record after the physical demonstration made of the slides on a projector that the only credible explanation of authorship was that of Freeman. This necessarily stamped as Freeman's the type-script from which the slides shown in Cleveland and at the Hilton Hotel were made and which furnished the text in the Harvard 1984 syllabus and eventually Exhibit P–1.

The Court finds, based upon all of the facts and circumstances in evidence, that there was no violative use of Exhibit P–1 by the defendant.

During the course of Weissmann's direct examination, the Court overruled a defense objection with a statement of its desire to find out why this controversy had come to court. Judging by the hostility evident in Weissmann's demeanor and testimony, the answer appears to be that this action was brought for personal reasons—be they grievances against Montefiore, or against Freeman himself for recommending her for reappointment on a probationary basis—those go beyond and are outside of a claim of copyright infringement.

The defendant had recognized the outstanding abilities of his student and junior associate and had created every opportunity possible to promote Dr. Weissmann professionally, enabling her to advance her career significantly in a relatively short period of time.

There is no question as to plaintiff's stature, ability or reputation as a remarkable researcher and specialist in the area of hepatobiliary imaging. But, in short, it was the defendant who opened the doors for Dr. Weissmann, making all of her re-

search and writing possible and professionally recognized. The defendant was the one who had acquired the radiopharmaceutical from the manufacturer as a result of his renown in the medical community and his interest in staying on the cutting edge of medical technology. Even when the plaintiff was able to obtain a radiopharmaceutical in her own name, the defendant was ultimately responsible for the use of the drugs, as the person with whom "the buck stops." The plaintiff obtained and made use of the drug only as a result of her association and collaboration with the defendant. The plaintiff admitted that even after she became an instructor, the defendant had ultimate responsibility for the research activities taking place in his department.

It is unfortunate that two such accomplished scientists could not preserve their esteemed positions by resolving their differences in another forum.

### III. *The Applicable Law*

#### A. *Prima Facie Case*

 Introduction into evidence of a certificate of registration from the Copyright Office is prima facie proof of ownership. 17 U.S.C. § 410(c); *Durham Indus. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980). Valid copyright protection subsists only in *original* works of authorship. 17 U.S.C. § 102(a); *Durham Indus.*, 630 F.2d at 908–09. A certificate of registration thus constitutes prima facie evidence of the author's originality. 3 Nimmer § 12.11[A] at 12–78.

 The presumption of the registration's validity is a rebuttable one, and the burden shifts to the defendant to disprove validity. *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir.1985); 3 Nimmer § 12.11[A] at 12–80. Once the plaintiff presents a certificate of registration, he or she is relieved of proving "the multitude of facts" upon which issuance of the copyright is based, "unless the defendant, by effectively challenging them, shifts the burden of doing so to the plaintiff." *Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411, 414 (2d Cir.1985)

(quoting H.R.Rep. No. 1476, 94th Cong., 2d Sess. at 157, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5773). Judicial deference is given to the expertise of the Copyright Office—the agency charged with administering the copyright laws—unless "the Copyright Office had no opportunity to pass on plaintiff's claim accurately presented." *Russ Berrie & Co. v. Jerry Elsner Co.*, 482 F.Supp. 980, 988 (S.D.N.Y. 1980). Plainly, there was nothing before the Copyright Office when plaintiff submitted her application for registration of P–1 to enable it to pass accurately on plaintiff's claim.

#### B. *Joint Authorship*

 Section 201(a) of Title 17 U.S.C. provides: "Copyright in a work protected under [the Copyright Act] vests initially in the author or coauthors of the work." The product of joint authorship is a "joint work," in which "each contributor automatically acquires an undivided ownership in the entire work, including all of the contributions contained therein." 1 Nimmer § 6.06[A] at 6–14. Even if the respective contributions to the joint work are not equal, each joint author shares equally in the ownership of the work in the absence of an agreement to the contrary. *Id.* § 6.08 at 6–20.

A joint work is one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. The essence of a joint work is "a joint laboring in furtherance of a preconcerted common design." 1 Nimmer on Copyright § 6.03 at 6–6; *see also Picture Music, Inc. v. Bourne, Inc.*, 314 F.Supp. 640, 645 (S.D.N.Y.1970) (Pollack, J.) ("When two or more authors pursuing a common design together create a single work, they become joint owners of the work...."), *aff'd on other grounds*, 457 F.2d 1213 (2d Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972).

As stated in *Donna v. Dodd, Mead & Co.*, 374 F.Supp. 429 (S.D.N.Y.1974):

Although traditionally creation of a joint work required a common design which existed before the elements of the work were produced, that requirement has been considerably eroded. Nimmer on Copyright § 69. In [*Edward B. Marks Music Corp. v. Jerry Vogel Music Co.,* 140 F.2d 266 (2d Cir.1944)], the Court of Appeals for this Circuit held that a joint work can result from the labors of persons who are strangers to each other and who work at different times, if each contributor contemplates that his work will form part of a whole to which someone else will also contribute. Subsequently, the preconcerted design standard for joint authorship was further relaxed in *Shapiro, Bernstein & Co., Inc. v. Jerry Vogel Music Co., Inc. ("12th Street Rag"),* 221 F.2d 569, modified on rehearing, 223 F.2d 252 (2d Cir.1955). *12th Street Rag* held that, even if at the time one element of a joint work is created no intent to contribute to a joint work exists, if at any time thereafter the author or his assignee conceives and carries out such an intention, the resulting combination will be joint work.

374 F.Supp. at 430. The continued validity of the *12th Street Rag* doctrine is unclear, and the current Copyright Act, which defines joint ownership, has been said to reject the *12th Street Rag* doctrine. *See* 1 Nimmer § 6.03 at 6–8–9.

The respective contributions of several authors to a single work need not be equal either quantitatively or qualitatively in order to constitute such contributors as joint authors. *Maurel v. Smith,* 271 F. 211 (2d Cir.1921). However, "each such contribution must, in any event, be more than *de minimis.*" 1 Nimmer § 6.07 at 6–18 (citing *Picture Music,* 314 F.Supp. 640).

A joint owner cannot be liable to a co-owner for copyright infringement, since a copyright owner cannot infringe his own copyright. *Donna v. Dodd, Mead & Co.,* 374 F.Supp. at 430. One joint owner may license the work without the other's consent, "subject only to a duty to account." *Id.* at 430–31. Likewise, each joint owner may make revisions and publish the original or the revised work. *Weinstein v. University of Illinois,* 811 F.2d 1091, 1095 (7th Cir.1987).

As joint author of the 1985 RSNA paper, Freeman can not be liable for copyright infringement. He was entitled to submit the jointly owned product for the August 1987 Mount Sinai review course without Weissmann's consent and was merely required to account to Weissmann, the joint owner, for any profits derived from use of the work. Freeman received the honorarium, $250, from Mount Sinai for his lecture even without the use of the syllabus in question; he earned no profit at all and has nothing for which to account.

## C. *Derivative Works*

The allegedly infringed work does not constitute a "derivative work" either.

17 U.S.C. § 101 defines a derivative work as one "based upon one or more preexisting works." While derivative works are specifically included in the Copyright Act as being copyrightable, 17 U.S.C. § 103, "to support a copyright the original aspects of a derivative work must be more than trivial … [and] the scope of protection afforded a derivative work must reflect the degree to which it relies on preexisting material." *Durham Indus. v. Tomy Corp.,* 630 F.2d at 909. This analysis is based upon the premise that " 'the one pervading element prerequisite to copyright protection regardless of the form of the work' is the requirement of originality —that the work be the original product of the claimant." *L. Batlin & Son v. Snyder,* 536 F.2d at 489–90 (quoting 1 Nimmer on Copyright § 10 (1975)); *see* 1 Nimmer § 2.01 at 2–5. This requirement has been interpreted to mean a copyrightable work must contain "some substantial" and "not merely a trivial" variation. *See Durham Indus.,* 630 F.2d at 910; *L. Batlin,* 536 F.2d at 491. Thus, only non-trivial, original features contributed by the author or creator of a derivative work are entitled to copyright protection. *Id.*

The 1985 RSNA syllabus was merely the "latest version of the collaborative work" that had been evolving since 1980. The paper "was essentially in good part [Freeman's] own work in terms of the false positive section. It had a lot of other collaborative work that [the parties] had evolved as the document appeared and periodically was updated and changed from 1980 on." The few sentences and "paragraph or two" that Freeman concedes Weissmann may have added to the prior jointly authored works amount to "only a 'miniscule variation,' demonstrating no more than 'trivial' originality." *Past Pluto Productions Corp. v. Dana*, 627 F.Supp. 1435 (S.D.N.Y.1986) (quoting *Durham Indus.*, 630 F.2d at 910). Only a minimal amount of originality is necessary to warrant copyright protection; however, in the light of the testimony which the Court accepts as credible, Weissmann's contributions updating the prior stock piece jointly authored by Weissmann and Freeman and used by both Weissmann and Freeman for educational review courses constitute "'merely trivial' variation[s]." *Russ Berrie & Co.*, 482 F.Supp. at 989 (quoting *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102–03 (2d Cir.1951)).

Often, the subjective selection and arrangement of data can merit copyright protection. *See Eckes v. Card Prices Update*, 736 F.2d 859, 863 (2d Cir.1984). However, the identical sections were used in prior papers jointly authored in virtually verbatim fashion and the update was done as part of the evolution of the stock piece; plaintiff's modifications of pre-existing joint works therefore do not warrant protection under the copyright laws.

The prima facie case established by plaintiff's submission of the federal copyright registration has been successfully rebutted by the credible evidence that plaintiff's 1985 RSNA paper itself was prepared from prior works jointly authored by plaintiff and defendant and was an evolutionary stock piece. *See Russ Berrie & Co.*, 482 F.Supp. at 987. The plaintiff's modifications to the prior works are not of sufficient originality to support copyright protection.

### D. *Fair Use*

Even if Freeman were not a joint author of the allegedly infringed work, his anticipated use of a copy of P–1 was a fair use.

Section 107 of Title 17 places a limitation on the exclusive right in copyrighted works, stating:

> [T]he fair use of a copyrighted work, including such use by reproduction in copies ..., for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.

Four factors are to be considered in determining fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

These enumerated factors "are not meant to be exclusive: '[S]ince the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts.'" *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 560, 105 S.Ct. 2218, 2231, 85 L.Ed. 2d 588 (1985) (quoting H.R.Rep. No. 1476, 94th Cong., at 65 (1976)).

With respect to the first factor, "the crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Id.* at 562, 105 S.Ct. at 2231. The propriety of the defendant's conduct is also relevant to the character of the use. *Id.* "[F]air use presupposes that the defendant

has acted fairly and in good faith." *Marcus v. Rowley*, 695 F.2d 1171, 1175 (9th Cir.1983); *Time Inc. v. Bernard Geis Assoc.*, 293 F.Supp. 130, 146 (S.D.N.Y.1968).

Here, Freeman's contemplated use was entirely noncommercial and for nonprofit educational purposes. Freeman neither profited from the paper's use—he received the promised $250 honorarium even without using the handout—nor stood to profit had he included the syllabus in the course materials. Weissmann's stipulation to limit her damages to Freeman's economic gain, which could not have exceeded $250, indicates that there is no market value attached to P–1. Indeed, no evidence was proffered to prove otherwise. In addition, Freeman believed in good faith that he was entitled to use the stock piece for the nonprofit review course.

As for the second factor, "[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row*, 471 U.S. at 563, 105 S.Ct. at 2231. Moreover, "[t]he fact that a work is unpublished is a critical element of its 'nature.'" *Id.* at 564, 105 S.Ct. at 2232. *Accord Salinger v. Random House, Inc.*, 811 F.2d 90, 97 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987). This factor weighs heavily in favor of Freeman. The syllabus here is factual and scientific in nature and it was disseminated by Weissmann herself and published in the 1985 RSNA booklet.

Under the third factor, the general rule is that the use "may not constitute a fair use if the entire work is reproduced." 3 Nimmer § 13.05[A] at 13–79; § 13.05[D] at 13–90.10–13–90.11. Although Freeman copied all of P–1, the content virtually in its entirety had been published in the name of both parties as joint authors, reducing to *de minimis* the very slight additions to the work as already indicated.

The fourth factor "is undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566, 105 S.Ct. at 2234. " 'Fair use is limited to copying by others which does not materially impair the marketability of the work which is copied.' " *Id.* at 566–67, 105 S.Ct. at 2234

(quoting 1 Nimmer § 1.10[D] at 1–87). Freeman's contemplated use of P–1 would not impair its market value at all, if any exists, and dissemination of the results of the research being done at Montefiore would in all likelihood only increase the "marketability" of a paper emanating from that department.

On balance, Freeman's was a fair intended use.

## IV. *Defendant's Attorney's Fees*

Defendant, in addition to demanding declaratory relief and a dismissal, seeks costs and reasonable attorney's fees pursuant to 17 U.S.C. § 505, based on plaintiff's allegedly meritless claims.

Fees to a prevailing defendant should not be awarded when the plaintiff's claim is colorable since such awards would diminish the intended incentive to bring such claims. When the plaintiff's claims are objectively without arguable merit, however, a prevailing defendant may recover attorney's fees under Section 505.

*Diamond v. Am–Law Publishing Corp.*, 745 F.2d 142, 148 (2d Cir.1984).

In order to award attorneys' fees to a defendant, a court must find plaintiff's suit to be "baseless, frivolous, unreasonable, or brought in bad faith." *Grosset & Dunlap, Inc. v. Gulf & Western Corp.*, 534 F.Supp. 606, 610 (S.D.N.Y.1982); *Gardner v. Nizer*, 396 F.Supp. 63, 64 (S.D.N.Y.1975). "[A] finding of subjective bad faith is not necessary...." *Diamond*, 745 F.2d at 148. Attorneys' fees to a prevailing defendant are to be awarded circumspectly, particularly since they serve the purpose of "penalizing the losing party." *Roth v. Pritikin*, 787 F.2d 54, 57 (2d Cir.1986). An award of attorneys' fees is within the sound discretion of the Court. *See Diamond*, 745 F.2d at 149; *Warner Bros. Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 248 (2d Cir.1983).

Plaintiff brought this litigation precipitately and perhaps unnecessarily. She sought to bolster her claims by short-sighted and untrue denials of the collaborative and sometimes personal authorship of the defendant of the stock piece—denials that

went so far as to state that Freeman did not participate at all and, in answer to a question from the Court, that not a word, sentence or thought in P-1 was that of Freeman. Plainly the overbroad position she took resulted in a grave insult to her mentor and professional colleague. Dr. Freeman had neither motive nor need to plagiarize, considering his preeminent grasp of the subject.

Withal, taking into account all of the facts and circumstances shown in the record, the Court believes that the plaintiff's resort to the courts was misguided ego and not essentially to impair the reputation and standing of the defendant. The plaintiff did stipulate that no actual damage resulted and limited her claim to defendant's economic gain from the alleged infringement. *See Grosset & Dunlap*, 534 F.Supp. at 611. It will serve no useful purpose to perpetuate her feuding by imposing attorney's fees, and in an endeavor to lay the emotions here involved to rest, the Court will treat the claims as an unfortunate lapse of judgment not requiring a penalty award of attorney's fees to defendant.

The Second Circuit has stated (Pratt, J.), in a case also filled with sharply conflicting testimony:

> A factfinder's decision that one party's version of the events is more credible than the other party's is, without more, insufficient to justify an award of attorneys' fees to a prevailing defendant under the Copyright Act.

*Roth v. Pritikin*, 787 F.2d at 58.

The defendant here is amply vindicated as a professional matter by exposure of the facts.

*Conclusion*

Accordingly, for the reasons stated herein, plaintiff's request for injunctive relief is denied and her claims are dismissed on the merits, with costs to be taxed by the Clerk.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a), Fed.R.Civ.P.

Submit judgment accordingly in conformity with Rule 54, Fed.R.Civ.P.

So Ordered.