Heidi S. WEISSMANN, M.D.,
Plaintiff–Appellant,
Cross–Appellee,

v.

Leonard M. FREEMAN, M.D.,
Defendant–Appellee,
Cross–Appellant.

Nos. 225, 353, Dockets 88–7435, 88–7465.

United States Court of Appeals,
Second Circuit.

Argued Oct. 20, 1988.

Decided Feb. 23, 1989.

Roger L. Zissu (Cowan, Liebowitz & Latman, New York City, of counsel), for plaintiff-appellant, cross-appellee.

Guy R. Fairstein (Summit Robins & Feldesman, New York City, of counsel), for defendant-appellee, cross-appellant.

Before LUMBARD, CARDAMONE and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal presents the paradigm of the problems that arise when a long relationship between accomplished professor and brilliant assistant comes to an end. Together the two had researched and co-authored scholarly scientific works. When the appellant—the younger assistant—individually wrote what she considered a new work, the appellee—the mentor—believing himself a co-author of the new piece, used his assistant's work, styling it as his own, and thereby precipitated the instant litigation.

Heidi S. Weissmann, M.D. appeals the dismissal after a bench trial in the Southern District of New York (Pollack, J.), of her copyright infringement suit against Leonard M. Freeman, M.D. Among the issues presented on appeal is the novel question of whether a medical paper derived from the parties' prior jointly authored works is itself a joint work, or whether it is a copyrightable individual derivative work, the infringement of which gives rise to a cause of action under the Copyright Act, 17 U.S.C. § 101, *et seq.* (1982 & Supp. III 1985).

## FACTS

The parties are both accomplished scientists in the field of nuclear medicine. Appellant Weissmann is an Associate Professor of Radiology and Nuclear Medicine at the Albert Einstein College of Medicine (Einstein), and is an attending physician specializing in nuclear medicine at the Montefiore Medical Center (Montefiore). She has received numerous awards in the area of radionuclide imaging, and published more than 80 scholarly articles. Appellee Freeman is also a prolific author, and a noted lecturer in the fields of nuclear medicine and diagnostic radiology. He has served as President of the Society of Nuclear Medicine, and currently is a professor of Radiology and of Nuclear Medicine at Einstein, where he has taught since 1964. He is the Director of the Nuclear Medicine Service at Montefiore and Vice–Chairman of the Department of Nuclear Medicine at Einstein.

The parties' professional association began in 1977 when Dr. Weissmann was in her fourth year of residency at Montefiore and Dr. Freeman was Chief of the Division of Nuclear Medicine at that hospital. In early 1977 appellee was researching the application of the derivatives of a certain radiopharmaceutical, iminodiacetic acid (IDA). IDA is a substance labeled with a radioactive isotope that is injected into the bloodstream and, when picked up by the liver, permits diagnosis of certain liver and biliary disorders. In the late 1970's drug manufacturers producing IDA analogs needed scientists to develop a patient data base to obtain approval of their Food and Drug Administration applications in order to market the isotopes in the United States. One selected scientist was Dr. Freeman, who began using the IDA analogs in his research efforts. As a fourth-year resident, appellant worked on these initial studies under Dr. Freeman's tutelage. The parties' first jointly authored article on IDA derivatives was published in January 1979. Over the next several years a series of articles on the use of IDA scanning in diagnosing biliary diseases were published in the names of Freeman, Weissmann, and other scientists.

Beginning in 1980 the parties worked together as researchers and co-authors of a number of papers focusing on various aspects of nuclear medicine, particularly IDA imaging. Prior versions of the work alleged to have been infringed in the instant litigation were first written in 1980 for a nuclear medicine review course sponsored

by the Harvard Medical School. The district court found that the work in which appellant claims a copyright (Plaintiff's exhibit 1 or P–1) is a "syllabus," that is, a paper reviewing the state of the art of hepatobiliary imaging techniques, prepared to accompany lectures, and used by medical residents to study for specialty boards. From 1980 to 1985 prior versions of P–1 were constantly revised and updated by the parties in an ongoing cooperative effort.

In 1985 Dr. Weissmann authored the article that precipitated the present copyright suit. It was entitled "Hepatobiliary Imaging" (P–1), and reported on a relatively new diagnostic technique employing radioactive analogs of the agent IDA. The work was prepared as a chapter for the Radiological Society of North America's book entitled "Syllabus: A Categorical Course in Nuclear Medicine," printed and published in 1985. The publication listed Dr. Weissmann as the article's sole author.

Appellant's creation admittedly was derived from previous papers jointly written by the parties during the course of their professional relationship that extended from 1977 to 1984. An examination of the relevant documents reveals that portions of P–1 were taken virtually verbatim from prior jointly authored pieces that had been presented at Einstein and at the Mount Sinai School of Medicine (Mount Sinai) in 1983 and 1984 respectively. Although P–1 appears to restate the central propositions asserted in the prior works, Weissmann's exhibits includes the following new elements: (1) a new selection of photo illustrations and associated captions; (2) references to four recent reports in the pertinent literature; (3) new textual additions; and (4) reorganization of previous material. Appellee conceded at trial that this material in P–1 was created solely by appellant.

In the summer of 1987 Dr. Freeman was invited to give a review course on nuclear medicine at Mount Sinai. He prepared P–1 to use in giving the course by deleting Dr. Weissmann's name from P–1 and replacing it with his own, and by adding three words to the title. Fifty copies of the article were made. Before the date set for the course,

appellant obtained one of the copies, and through counsel requested that her revised article not be circulated, and that all those who had received copies be informed that she claimed sole authorship of it. The article was removed from the packet of course materials. Dr. Freeman delivered his lecture without the use of his version of P–1.

After this incident, Weissmann filed the instant suit alleging copyright infringement in violation of 17 U.S.C. § 501 (1982 & Supp.1985). In her prayer for relief she sought a declaration that Freeman had committed actionable infringement, an injunction permanently restraining him from infringing, and an award of actual damages and profits. Appellant consented to the dismissal of her claim for attorney's fees because the copyright she obtained covering P–1 was not registered before the suit was commenced, and such is a statutory prerequisite to a claim for attorney's fees.

## PROCEEDINGS BELOW

After a four-day bench trial, Judge Pollack in a written decision concluded that Dr. Freeman's use of P–1 did not violate the copyright law. 684 F.Supp. 1248 (S.D. N.Y.1988). In support of its determination that Freeman had not infringed any legally cognizable rights that appellant may have had in P–1, the district court found that appellee was a joint author, and therefore a co-owner of any copyright Weissmann acquired in the article. 684 F.Supp. at 1260. The trial court also determined that P–1's new matter was too trivial to qualify for protection as a derivative work under the copyright statute. *Id.* at 1261. Additionally, it ruled that even were Freeman not a joint author of the allegedly infringed work, and even were P–1's new matter copyrightable, Freeman's purported use of P–1 was a fair use within the purview of § 107 of the Copyright Act. *Id.* at 1261–62.

In the course of the proceedings the district court denied appellant's two substantive motions. The first was pursuant to Rule 15(b) for leave to amend the pleadings to conform to the proof. Appellant sought

to have the court evaluate and consider claims arising from appellee's allegedly publishing another verbatim copy of P–1 under his name for a December 1986 symposium in the Republic of China (the Taiwan Publication), and the supposed proof that Freeman's conduct constituted misrepresentation of origin under § 43(a) of the Lanham Act and under the common law. The second motion made under Rule 60(b) sought reconsideration by the trial court of its finding that the Taiwan Publication had not been proven to be connected with Dr. Freeman. Appellee's request for attorney's fees and for sanctions was denied. Appellant appeals from the dismissal of her copyright infringement suit, and appellee cross-appeals from the denial of attorney's fees and sanctions against appellant.

## DISCUSSION

On appeal appellant argues that the district court erred in (1) determining that appellee was a joint author of P–1 within the meaning of §§ 101 and 201 of the Copyright Act, (2) concluding that P–1 did not contain sufficient new matter to qualify for copyright protection as a derivative work under §§ 101 and 103(b), and (3) deciding that, even if appellee was not a joint author and the article therefore did qualify for protection as a derivative work, appellee's use of P–1 constituted a fair use under § 107, and (4) denying appellant's 15(b) and 60(b) motions.

### I  *Joint Authorship*

■ Before discussing whether P–1 was a joint work, we set forth the standard of review to be applied to the district court's determination that P–1 was such a work. Ordinarily the clearly erroneous standard under Fed.R.Civ.P. 52(a) would govern. But, when a district court makes findings of fact predicated upon an incorrect legal standard such findings are not binding on an appellate court. *See United States v. Parke, Davis & Co.*, 362 U.S. 29, 44, 80 S.Ct. 503, 511–12, 4 L.Ed.2d 505 (1960) (Rule 52 inapplicable where district court's findings premised on erroneous view of legal standard).

■ Here the district court determined that the entire series of the parties' works on the subject of radionuclide imaging—including the work alleged to have been infringed—constituted a single evolutionary joint work. It discussed the conceded joint authorship in the preexisting works. Without making any specific findings respecting P–1 itself, the court found that Dr. Freeman was a co-owner of P–1 and that P–1 was a joint work. The trial court made this surprising finding despite Dr. Freeman's concession that he had no hand in P–1's preparation. The finding was made based on the district court's mistaken view that joint authorship of the prior existing works automatically makes the two joint authors co-owners of the derivative work. Such a ruling stands copyright law on its head. It flies in the face of the Copyright Act which affords protection to each work at the moment of its creation. Thus, § 101 provides for those works prepared over time that "the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work."

Of greater significance is that the trial court's view would convert all derivative works based upon jointly authored works into joint works, regardless of whether there had been any joint labor on the subsequent version. If such were the law, it would eviscerate the independent copyright protection that attaches to a derivative work that is wholly independent of the protection afforded the preexisting work. *See* § 103(b). Hence, it was a plain error for the district court to rule, as a matter of law, that Dr. Freeman's joint authorship of the prior works made him a joint author with appellant in the derivative work.

The district court also made a finding of fact that Dr. Freeman was a joint author with Dr. Weissmann of P–1. Section 201(a) of the Act provides: "Copyright in a work protected under [the Copyright Act] vests initially in the author or co-authors of the work." Section 101 defines a "joint work" as one "prepared by two or more authors with the intention that their contributions

be merged into inseparable or interdependent parts of a unitary whole." In a joint work each author "automatically acquires an undivided ownership in the entire work" including any portion of it. 1 M. Nimmer, *Nimmer on Copyright* § 6.03, at 6–6 (1988). Thus, an action for infringement between joint owners will not lie because an individual cannot infringe his own copyright. The only duty joint owners have with respect to their joint work is to account for profits from its use. *See Donna v. Dodd, Mead & Co.*, 374 F.Supp. 429, 430 (S.D.N.Y.1974).

A review of the meaning of §§ 101 and 103(b) and of their legislative history reveals two basic criteria that must be satisfied before one is a joint author of a derivative work. First, each putative author must have "contributed" to the work. Second, each must intend to contribute to a joint work at the time his or her alleged contribution is made. Because § 103(b) extends independent protection to derivative works, an intent to contribute or an actual contribution to previous works does not serve as proof of ownership in the derivative work. *See* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 1, 120, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5736 (*House Report*). We consider these two criteria.

### A. Contribution to Derivative Work

The statute envisions that each author contribute to a joint work. "Under the [§ 101] definition a work would not be 'joint' unless its authors collaborated among themselves or unless each of the authors knew, at the time the work was being written, that his contribution would be integrated as an 'inseparable' or 'interdependent' part of a 'unitary whole.'" *Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law:* 1965 Revision Bill, 89th Cong., 1st Sess., Copyright Law Revision Part 6, at 65 (House Comm. Print 1965), *reprinted in* 1 Copyright Law Revision (1964–1965).

In enacting the definition of a joint work set forth in § 101, Congress endeavored to "make[ ] plain that copyright in a derivative work is independent of, and does not enlarge the scope of rights in, any pre-existing material incorporated in it. There [was] thus no need to spell this conclusion out in the definition of 'joint work.'" *House Report* at 120, U.S.Code Cong. & Admin.News at p. 5736. The legislative history clearly indicates that one cannot be deemed to be a joint author without actually collaborating in the work's preparation. Critical therefore "is the intention, at the time the writing is done, that the parts be absorbed or combined into an integrated unit." *Id.*, U.S.Code Cong. & Admin.News at p. 5736. That intention must be with respect to the work in which a copyright is claimed, not with respect to the prior works from which it is derived. *See MCA, Inc. v. Wilson*, 425 F.Supp. 443, 455 (S.D.N.Y. 1976) (owner of underlying work obtains no property rights in derivative work), *aff'd*, 677 F.2d 180 (2d Cir.1981).

In the case at hand, because Dr. Freeman conceded that he had not participated in drafting the new matter included in P–1, it follows as a logical corollary, therefore, that he acquired no interest in or right to use P–1 beyond those rights which he had as co-author in the prior joint material incorporated into P–1. Even though one co-author has the right to revise a joint work in order to create an individual derivative work, the other co-author acquires no property rights in the newly created work prepared without his involvement. *See Dynamic Solutions, Inc. v. Planning and Control, Inc.*, 646 F.Supp. 1329, 1338–39 (S.D.N.Y.1986) (even sole author/owner of pre-existing material contained in derivative work has no property right in new matter created for the derivative work added without his participation); *see also Weinstein v. University of Illinois*, 811 F.2d 1091, 1095 (7th Cir.1987); *House Report* at 120, U.S.Code Cong. & Admin. News at p. 5736; 1 Nimmer § 6.06[B], at 6–15.

### B. Intent to Contribute to Derivative Work

The second point upon which inquiry is focused is Dr. Weissmann's intent. The

district court made no express finding on this critical issue. It simply stated in conclusory fashion that because the parties had intended P–1's predecessors to be used jointly as a "stock piece" to accompany their review lectures, they had somehow impliedly agreed that all future works on the subject of radioactive analogs of IDA, including P–1, would also be a joint work.

In order for a work to be deemed a joint work, the parties must evince "the *intention* that their contributions be merged," § 101 (emphasis added), "at the time the writing is done," *House Report* at 120, U.S.Code Cong. & Admin.News at p. 5736, not at some later date. *See* 1 Nimmer § 6.03, at 6–7. The law on this point is set forth in *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.,* 140 F.2d 266 (2d Cir.1944) (L. Hand, J.). There it was observed that a finding of joint authorship requires that each author intend his or her contribution, at the time that it is created, to become part of a unitary work to which another will make or already has made a contribution. Or, as Judge Hand stated it, "when both plan an undivided whole ..., their separate interests will be as inextricably involved, as are the threads out of which they have woven the seamless fabric of the work." *Id.* at 267; *see also Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.,* ("*Melancholy Baby*"), 161 F.2d 406, 409 (2d Cir.1946), *cert. denied,* 331 U.S. 820, 67 S.Ct. 1310, 91 L.Ed. 1837 (1947).

*Marks* was a case in which one individual had written the lyrics for a song and another had written the music. Neither party knew the other, but both were aware that their individual efforts would not stand alone. In holding that the resulting song was a joint work, the critical fact was that both parties were equally aware that their individual authorship efforts would have to be combined in order to create the final integrated product—a commercially viable song. *See Marks,* 140 F.2d at 267. From this, the rule has evolved that an author who intends to create a joint work must clearly demonstrate his or her intent in that regard. Although such an intent may, as in *Marks,* be inferred from the circumstances surrounding the creation of the work, in the absence of such a showing, the work is presumed to be the product of an individual author and is the sole property of its creator. *See, e.g., Gilliam v. American Broadcasting Cos., Inc.,* 538 F.2d 14, 22 (2d Cir.1976) (Lumbard, J.) (reservation of rights by one party inconsistent with joint authorship and work not therefore joint); *Picture Music, Inc. v. Bourne, Inc.,* 314 F.Supp. 640, 645 (S.D.N.Y.1970) (declining to find joint authorship where a "common design to create a single work" not shown to exist), *aff'd on other grounds,* 457 F.2d 1213 (2d Cir.), *cert. denied,* 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972); *cf. Community for Creative Non–Violence v. Reid,* 846 F.2d 1485, 1497 (D.C.Cir.1988), *cert. granted,* — U.S. —, 109 S.Ct. 362, 102 L.Ed.2d 352 (1988).

In the present case, Drs. Weissmann and Freeman collaborated in the preparation and publication of the works from which P–1 was derived. Yet, there is no evidence that they intended their joint product to be forever indivisible like the finite whole of the completed single song in *Marks.* The facts point to a contrary conclusion. Scientific research is a quest for new discoveries and the preexisting joint works by definition were continually evolving. Dr. Weissmann believed she had a new and better approach and decided to author her research alone. Section 103(b) of the Copyright Act gives her that right when it extends independent protection to derivative works. The joint authorship of the underlying work does not confer any property right in the new work, save those rights which the co-author (here Dr. Freeman) of the previous works retains in the material used as part of the compilation of the derivative work. The district court opinion reveals a fundamental misunderstanding of these principles. This misconception is reflected in its discussion of Dr. Weissmann's intent to merge her efforts with Dr. Freeman based only on P–1's predecessors, and not on P–1 itself.

## C. Appellant's Intent to Create a Derivative Work

The remainder of discussion of joint authorship concerns the substantial and un-

controverted evidence that Dr. Weissmann intended P–1 to be her own individual work. As a preliminary matter, it is important to note that of the 88 articles, abstracts, and book chapters listed on her curriculum vitae, 71 credit Dr. Freeman as a co-author. Appellant's having deviated from that pattern in submitting P–1 for publication as a chapter in the Radiological Society of North America's book under the name "Heidi S. Weissmann" is persuasive proof of the fact that she intended this particular piece to represent her own individual authorship. Appellant's use of her own by-line on P–1 constitutes *prima facie* proof that this work was not intended to be joint. Appellee failed to produce any evidence to rebut appellant's showing. In fact, Dr. Freeman lectured at the same meeting at which P–1 was first presented, and made no objection to the omission of his name from it.

Again, had the trial court separately considered P–1, it would have concluded that appellant's article was the only work with respect to which it was repeatedly conceded that appellee had played no role. Yet, the trial judge found that "plaintiff did almost all of the writing" for the works listed on her resume of which Freeman was a "co-author" and that she routinely "submitted drafts to Dr. Freeman before publication." 684 F.Supp. at 1254. It also found that "[s]he would always make sure to leave a copy of a manuscript on his desk if he was not in town or busy with other commitments; she did not always get comments back, but often she did." *Id.* Hence, it is significant on the issue of appellant's intent that P–1 was one of those few works that was not submitted for Dr. Freeman's review and on which she did not receive his comments. These facts —found by the district court—strongly evidence appellant's intent that P–1 be solely her own work.

The district court found that Freeman's participation in the preparation of P–1 was "strikingly illustrated" by Weissmann's inclusion in P–1 of a section entitled "False–Positive Studies for Acute Cholecystitis" which Dr. Freeman had independently composed for a 1984 Harvard review course.

The incorporation of this material into P–1 is irrelevant to the question of whether or not the parties intended P–1 to be a joint work. Appellant correctly points out that the inclusion of the "False Positive" section is not proof of any intention on Dr. Freeman's part to make a contribution to P–1 because, prior to 1985, he could not have formed an intent to contribute his efforts to her then nonexistent work.

In sum, the evidence presented at trial fully supports appellant's contention that the work alleged to have been infringed was solely the product of her authorship efforts. Although her work derived from preexisting jointly authored material, appellee played no role in P–1's creation. As a non-contributing party to P–1, Dr. Freeman's intent regarding his contributions to the underlying preexisting work is not relevant to claimed joint authorship of P–1. The district court's conclusion that P–1 was a joint work because the entire series of the parties' articles on IDA, including P–1, was one evolutionary joint work disregards the copyright protection accorded derivative works, independent of the preexisting works under § 103(b). As a consequence of its plain error of law in this regard, the district court's finding of fact that Freeman's co-authorship of the preexisting works also made him a joint author of P–1 is clearly erroneous.

## II  *Derivative Work*

■ We now turn attention to whether P–1 qualifies for protection as a derivative work as that term is defined by the Copyright Act. To establish a claim of copyright infringement, plaintiff must prove ownership of a valid copyright and copying by the defendant. With Dr. Freeman's copying admitted, the only question is whether Dr. Weissmann owned a valid copyright in a so-called derivative work. Although her certificate of registration "constitute[s] prima facie evidence of the validity of the copyright and of the facts stated in the certificate," 17 U.S.C. § 410(c), it is not conclusive on the issue of copyrightability; it merely creates a presumption of validity. *See, e.g., Durham*

*Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir.1980); *Past Pluto Productions Corp. v. Dana*, 627 F.Supp. 1435, 1440 (S.D.N.Y.1986) (certificate shifts burden to defendant to disprove copyright's validity).

Section 101 of the Copyright Act defines a "derivative work" as one that is based on "preexisting works." In addition, § 103(b) provides as follows

> The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such a work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

Section 101 of the statute further defines a derivative work as "[a] work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship...." Thus, it is clear that "the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments" are protected under the copyright laws. *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 95–96 (2d Cir.1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978).

The principle of derivative work protection is subject to two important limitations, both of which were purportedly recognized by the district court. To support a copyright, a derivative work must be more than trivial, and the protection afforded a derivative work must reflect the degree to which the derivative work relies on preexisting material, without diminishing the scope of the latter's copyright protection. *Durham Indus.*, 630 F.2d at 909. This rule is premised on the notion that " 'the one pervading element prerequisite to copyright protection regardless of the form of work' is the requirement of originality—

that the work be the original product of the claimant." *L. Batlin & Son v. Snyder*, 536 F.2d 486, 489–90 (2d Cir.) (*en banc*) (quoting 1 Nimmer § 10, at 32 (1975)), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed. 2d 135 (1976). Originality is and always has been rightly prized. Dostoevsky, for example, insisted that the measure of a person's worth in pre-Revolutionary Russia did not depend so much on money or position, as it did on one's originality. F. Dostoevsky, *The Idiot*, Part I (Garrett Trans. 1958). Mill wrote that "nothing was ever yet done which someone was not the first to do, and ... all good things which exist are the fruits of originality...." J.S. Mill, *On Liberty* 271 (Harv. Classics, Eliot ed. 1909).

In the law of copyright only an unmistakable dash of originality need be demonstrated, high standards of uniqueness in creativity are dispensed with. In deciding whether the originality of the matter added in P–1 is sufficient to qualify for protection as a derivative work, the standard enunciated in *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99 (2d Cir.1951) (Frank, J.), remains the law in this Circuit: "All that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own' " *Id.* at 102–03. The originality requirement for a revised version is a "minimal" or "modest" one. *See, e.g., Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 35 (2d Cir.1982); *Durham Indus.*, 630 F.2d at 910; *Puddu v. Buonamici Statuary, Inc.*, 450 F.2d 401, 402 (2d Cir.1971); *Millworth Converting Corp. v. Slifka*, 276 F.2d 443, 445 (2d Cir.1960).

The district court here concluded that P–1 and its predecessors had evolved over an extended period of time and that Weissmann's additions were minuscule, demonstrating little originality. 684 F.Supp. at 1261. Although recognizing that the selection and arrangement of data may merit copyright protection, *see Eckes v. Card Prices Update*, 736 F.2d 859, 863 (2d Cir.1984), the trial judge believed that "the update was done as part of the evolu-

tion of the stock piece" and that appellant's modifications of the preexisting joint works did not warrant copyright protection. 684 F.Supp. at 1261.

It was formerly our rule that where, as here, the originality of a work could be determined entirely by reference to documentary evidence, we were in as good a position as the district court to evaluate originality. *See Eden Toys,* 697 F.2d at 34 n. 6 and 35 (2d Cir.1982); *Taylor v. Lombard,* 606 F.2d 371, 372 (2d Cir.1979); *Jack Kahn Music Co. v. Baldwin Piano and Organ Co.,* 604 F.2d 755, 758 (2d Cir.1979). *But see Apex Oil v. Vanguard Oil & Service Co.,* 760 F.2d 417, 424 (2d Cir.1985) (Oakes, J. concurring) (suggesting that "appellate courts must not exercise *de novo* review over findings ... based ... on documents or objective evidence"). In 1985 Rule 52(a) of Fed.R.Civ.P. was amended so that findings of fact based upon documentary—along with oral—evidence are not to be set aside unless clearly erroneous.

In our view the district court implausibly overlooked the fact that appellant's 1985 selection of subject matter and content drawn from prior works and their rearrangement in P–1 is sufficiently the product of original authorship to warrant copyright protection. It failed to give detailed consideration to the new matter that Weissmann added to the parties' prior works in her authorship of P–1. Its main discussion of P–1's content is a passing reference to the addition of "only" four new sources from the relevant scientific literature. Although the credibility of the parties as witnesses was fully discussed, the relevance of such an inquiry is problematic when the evidence upon which the derivative work determination must be based is solely documentary. Credibility might have been relevant, for example, had the question of who actually authored the new material been contested. But it is scarcely pertinent to determining whether the newly-added matter satisfies the statutory requirements for protectability. Research has not revealed a single case in which credibility has been deemed significant—let alone dispositive—on the question of whether there is a sufficient level of originality in a given work to

render it copyrightable. While the district court's findings based on the credibility of witnesses is entitled to deference, the trial judge cannot insulate his findings on originality from appellate review by calling them credibility determinations. *Anderson v. City of Bessemer,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

Our examination of the relevant documents reveals that Weissmann's additions and modifications in P–1 extend well beyond the mere addition of "four sources." A thorough review of P–1 and of the works from which it is derived demonstrates that Dr. Weissmann added the following new elements to the existing prior joint work: (1) a selection and arrangement of photo illustrations and associated captions; (2) references to recent reports in the pertinent literature; (3) selection, condensation, and description of additional source material; (4) several new textual additions; (5) substantial rearrangement of the manner and order of presentation of material contained in the parties' prior joint works; and (6) the addition of a section on "congenital disorders," a revised treatment of "chronic cholecystitis," and the incorporation of Dr. Freeman's "false positive" studies.

The district court found that many of the foregoing additions and revisions repeated verbatim portions of prior works and, from that finding, concluded that P–1 was neither new nor copyrightable. This finding wholly ignores the statutory scheme that expressly protects the selection of subject matter and content from underlying works, as well as the rearrangement of preexisting material taken from those works. *See* 17 U.S.C. § 101 (defining derivative work as an "abridgment, condensation or any other form in which a work may be recast, transformed, or adapted"). Further, a comparison of the parties' prior works—including P–1's most recent predecessor—at once demonstrates numerous differences, and highlights the fact that P–1 gave IDA imaging new and original treatment. Moreover, Dr. Freeman's copying and distributing P–1 as his own work is further evidence of the nontriviality of Dr. Weissmann's work, since copying without regard

to a plaintiff's rights is probative on the issue of the originality of a work. *See Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 252, 23 S.Ct. 298, 300, 47 L.Ed. 460 (1903) (Holmes, J.) (that works have worth is sufficiently shown by desire to copy them "without regard to the plaintiff's rights").

We conclude therefore that the district court's holding that Weissmann could not acquire a copyright in a derivative work based upon a jointly authored work was an error of law that disregarded the provisions of § 103(b) and the protection it extends to derivative works. Moreover, Dr. Freeman failed to rebut the *prima facie* showing of copyrightability appellant obtained by her certificate of copyright registration. As a consequence, we hold that Dr. Weissmann's additions and modifications to the preexisting joint work satisfy the modest requirements set forth in § 103(b) and in the relevant case law sufficiently to make P–1 entitled to copyright protection as a derivative work. The district court's findings—upon which it reached a contrary legal conclusion—were clearly erroneous because they have left us, after a thorough review of all the evidence, with a firm conviction that the district court was mistaken. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948).

### III *Fair Use*

■ The next question to be addressed is whether Dr. Freeman's use of P–1 can be characterized as a "fair use" within the meaning of the Copyright Act, thus absolving him of liability as an infringer. Section 107 of that Act codifies the so-called "fair use" doctrine. It creates a privilege for others to use the copyrighted material in a reasonable manner despite the lack of the owner's consent. *See Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 306 (2d Cir.1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). The doctrine balances the exclusive right of copyright owners against "the public's interest in the dissemination of information affecting areas of universal con-

cern, such as art, science and industry." *Wainwright Securities*, 558 F.2d at 94.

The four statutory factors considered in making the fair use determination are: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. Congress established these nonexclusive factors as a guide to courts considering fair use. Determining whether the doctrine applies requires that each case be individually examined. *See Harper & Row Publishers v. Nation Enterprises*, 471 U.S. 539, 549, 105 S.Ct. 2218, 2224–25, 85 L.Ed. 2d 588 (1985).

Analysis begins not by elevating the statutory guides into inflexible rules, but with a review of the underlying equities. *See Financial Information, Inc. v. Moody's Investors Service, Inc.*, 751 F.2d 501, 508 (2d Cir.1984) (fair use requires "sensitive balancing of interests," and the statutory factors are not hurdles over which an infringer may leap safely from liability). Thus, in *Sony Corporation of America v. Universal City Studios*, 464 U.S. 417, 448, 104 S.Ct. 774, 792, 78 L.Ed.2d 574 (1984), the Supreme Court emphasized that the doctrine necessitates an "equitable rule of reason" analysis to determine whether an alleged infringer may shield himself from liability. *See also House Report* at 65, U.S.Code Cong. & Admin.News at p. 5679 (stating that "since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts"). In short, to make use of another's copyright material fairly presupposes that the actor acted fairly and in good faith. *See Marcus v. Rowley*, 695 F.2d 1171, 1175 (9th Cir.1983); *see also Roy Export Co. v. Columbia Broadcasting System, Inc.*, 503 F.Supp. 1137, 1146 (S.D.N.Y.1980) (good faith and fair dealing required), *aff'd*, 672 F.2d 1095 (2d Cir.),

*cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).

Hence, before undertaking a discussion of fair use, we consider the equitable considerations that exist in the case at bar. In this case, it cannot be ignored that Dr. Freeman not only neglected to credit appellant for her authorship of P–1, but actually attempted to pass off the work as his own, substituting his name as author in place of hers. Adding insult to this injury, he then distributed copies of her work, but modified the title slightly to one of his own devising. Even if, as Dr. Freeman claims, P–1 was a stock piece to be used by both parties to accompany their lectures, such use hardly justifies entirely appropriating another's work without crediting the author. Dr. Freeman's conduct severely undermines his right to claim the equitable defense of fair use. No case was cited—and we found none—that sustained such defense under circumstances where copying involved total deletion of the original author's name and substitution of the copier's. *See Rowley,* 695 F.2d at 1176 (failure to credit original author weighs against a finding of fair use).

Determining fair use is a mixed question of fact and law. The Supreme Court instructs that where the district court has found facts sufficient to allow evaluation of each of the statutory factors, appellate review may determine fair use as a matter of law. *Harper & Row,* 471 U.S. at 560, 105 S.Ct. at 2230. With that in mind, we focus on the factors enumerated in § 107.

### 1. The Purpose and Character of the Use

■ In examining this factor, the district court recognized that " 'the crux of the profit/non-profit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.' " 684 F.Supp. at 1261 (quoting *Harper & Row,* 471 U.S. at 562, 105 S.Ct. at 2231). The trial judge then concluded that because Dr. Freeman received only a $250 honorarium and did not "stand to profit," the first

factor cut in his favor. We think that conclusion misses the point of the above-quoted passage. Monetary gain is not the sole criterion. Dr. Freeman stood to gain recognition among his peers in the profession and authorship credit with his attempted use of Weissmann's article; he did so without paying the usual price that accompanies scientific research and writing, that is to say, by the sweat of his brow. Particularly in an academic setting, profit is ill-measured in dollars. Instead, what is valuable is recognition because it so often influences professional advancement and academic tenure. The absence of a dollars and cents profit does not inevitably lead to a finding of fair use. *See Rowley,* 695 F.2d at 1175.

■ Further, where, as here, appellee's use is for the same intrinsic purpose as Dr. Weissmann's, that is, as an adjunct to lectures delivered in professional symposia, such use seriously weakens a claimed fair use. *Id.; see also Iowa State Research Foundation, Inc. v. American Broadcasting Cos., Inc.,* 621 F.2d 57, 61 (2d Cir.1980) (suggesting that scope of the doctrine constricted when original and copy serve the same function).

Thus, the relevant evidence bearing upon the first factor does not support invocation of the doctrine. The district court's contrary conclusion is clearly erroneous. The trial court's statement that Freeman's use was entirely for non-profit purposes misapprehends the central proposition that the profit/non-profit distinction is context specific, not dollar dominated. Although the Supreme Court has observed that the fair use doctrine—particularly the first statutory factor—is not rigidly circumscribed by the so-called "productive use requirement," *Sony Corp.,* 464 U.S. at 455 n. 40, 104 S.Ct. at 795 n. 40 (1984), an unproductive use "may be helpful in calibrating the balance." *Id.* Again, Dr Freeman's use of P–1 for the intrinsic purpose for which it was prepared moves the balance of the calibration on the first factor against appellee.

### 2. The Nature of the Work

■ With respect to the second factor, the district court, again quoting *Harper &*

*Row,* stated that "[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." 471 U.S. at 563, 105 S.Ct. at 2232. From that, it found that because P–1 was a scientific work, this factor weighed heavily in appellee's favor. 684 F.Supp. at 1262.

Concededly, the scientific nature of P–1 tilts this factor toward appellee. Yet, the nature of the work is not the only matter considered. The Supreme Court instructs that "[t]he rights conferred by copyright are designed to assure contributors to the store of knowledge a fair return for their labors." *Harper & Row,* 471 U.S. at 546, 105 S.Ct. at 2223; *see also Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975). In *Mazer v. Stein,* 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954) the Court explained that by establishing a right to the use of one's expression—whether in the nature of fiction or fact—copyright provides the economic incentive to research and disseminate ideas.

Encouraging authors to use their talents by holding out a promise of reward for their efforts is the surest way to advance the public welfare. *Id.* at 219, 74 S.Ct. at 471. In this case it is necessary to keep in mind the danger that allowing wholesale appropriation of scientific works presents. The personal gain sought by Dr. Weissmann may not be directly related to immediate financial gain, but the copyright protection extended to her work nevertheless provides her with an incentive to continue research—an endeavor that, if successful, would and has led to professional and monetary benefits. Hence, while recognizing that fair use finds greater application in a factual scientific context, that recognition should not blind a court to the need to uphold those incentives necessary to the creation of works such as P–1. The district court's failure to consider incentives when weighing this factor was an error of law that led to its clearly erroneous finding regarding the "nature of the work" factor. Here, the incentive interests, in our view, balance the equitable scales so that the nature of the work factor does not tip decidedly in favor of either party.

### 3. The Amount and Substantiality of the Use

█ Pursuant to the third factor, "whatever the use, generally it may not constitute a fair use if the entire work is reproduced." 3 Nimmer § 13.05[A], at 13–80. On this point the district court concluded—consistent with its finding that P–1 was not a copyrightable derivative work—that Dr. Freeman's copying of Dr. Weissmann's "slight additions" to the underlying joint work reduced the copying to a *"de minimis"* violation. We disagree.

We have previously held that the fair use privilege is grounded upon reasonableness, which may not be found in cases where there has been extensive verbatim copying or paraphrasing of another's material. *See Rosemont Enterprises,* 366 F.2d at 310. The subject work was impermissibly photocopied word-for-word with the only changes being the modification of the title and the substitution of credit for authorship; such use is patently not reasonable and the trial court's finding that it was *de minimis* is clearly erroneous.

### 4. The Effect on the Market for or Value of the Work

█ The fourth factor is the most important one in determining fair use. With respect to it, the district court held that Freeman's use of P–1 would not impair its market value, and stated that "dissemination of the results of the research being done at Montefiore would in all likelihood only increase the 'marketability' of a paper emanating from that department." 684 F.Supp. at 1262. Although it is self-evident that publication may increase marketability of departmental papers generally, we disagree with the district court's conclusion that this factor weighed in favor of Dr. Freeman. Dissemination in appellant's name, or in the names of both parties, would have had exactly the same effect in the market.

The Senate Report on the § 107 codification of the fair use doctrine states that "[w]ith certain special exceptions ... a use

that supplants any part of the normal market for a copyrighted work would ordinarily be considered an infringement." S.Rep. No. 473, 94th Cong., 1st Sess. 65 (1975). In our view, the particular market at issue here—namely, the world of scientific research and publication—functions is such a way as to encourage the creation and dissemination of papers such as P–1. *See Harper & Row,* 471 U.S. at 566 n. 9, 105 S.Ct. at 2233–34 n. 9. Because a copyright is used as a stimulant to creative effort, *see Sony Corp.,* 464 U.S. at 450–51, 104 S.Ct. at 793, it undercuts the congressional copyright scheme to role in a manner destructive of this creativity.

The rewards that Congress planned for copyright holders of scientific works to reap arguably include promotion and advancement in academia, where tenure decisions are often based on a "publish or perish" approach. In scholarly circles such as, for example, the small community of nuclear medicine specialists involved in this suit, recognition of one's scientific achievements is a vital part of one's professional life. The fact that Dr. Freeman's planned use of P–1 was for the same intrinsic purpose as that intended by Dr. Weissmann not only undermines Dr. Weissmann's ability to enjoy the fruits of her labor, but also creates a distinct disincentive for her to continue to research and publish in the field of nuclear medicine. Hence, to rule that this was a fair use would tend to disrupt the market for works of scientific research without conferring a commensurate public benefit. The district court's error on this fourth factor was in focusing on sales or dollars received, rather than upon the realities of promotion and tenure in an academic setting.

■ As earlier noted, the fair use doctrine is a flexible one that must be viewed in light of the particular circumstances of each case. When all of the statutory factors are considered in the context of scholarly scientific research and publication, they weigh against Dr. Freeman's right to invoke the fair use defense in Dr. Weissmann's infringement suit against him.

## IV  *Denial of 15(b) and 60(b) Motions*

Dr. Weissmann also appeals the denial of her post trial motions under Fed.R.Civ.P. 15(b) and 60(b). At the close of the trial, she moved under Rule 15(b) for leave to amend her complaint to conform to the proof and to add certain factual allegations concerning Dr. Freeman's submission of the so-called Taiwan Publication, and to add causes of action for copyright infringement, Lanham Act violations, and common law unfair competition. Essentially, appellant alleged that the trial evidence established that appellee's assertion of joint authorship violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982), and supported her common law claims based on a theory of false designation of origin. *See, e.g., Eden Toys,* 697 F.2d at 37 (incorrect attribution actionable under § 43(a)); *Smith v. Montoro,* 648 F.2d 602, 604–07 (9th Cir.1981). Judge Pollack denied the motion ruling that it was not timely asserted, insufficiently litigated, and based on unestablished premises.

Weissmann's second motion under Rule 60(b) contained a newly obtained declaration of Professor Chien Chung who served as director of the Taiwan symposium in which an infringing version of P–1 was allegedly published. On the basis of this declaration appellant sought to correct the trial court's supposed factual error in having ruled that the Taiwan Publication has not been proven to be connected with Dr. Freeman. This motion was denied on the grounds that it was not newly discovered evidence and, even if credited, would not alter the result on either the motion to amend or on the merits.

The district court's rulings on both of these motions is reviewable only for an abuse of discretion. *See Grand Light & Supply Co. v. Honeywell, Inc.,* 771 F.2d 672, 680 (2d Cir.1985); *Altman v. Connally,* 456 F.2d 1114, 1116 (2d Cir.1972). Because we cannot say on this record that the district court abused its discretion, we affirm its denial of appellant's post-trial motions.

### V  *Attorney's Fees*

As a cross-appellant, Dr. Freeman argues that the district court erred in denying an award of attorney's fees and sanctions. He also seeks sanctions and attorney's fees in this court arguing that Weissmann's appeal is frivolous. Obviously, we disagree with the latter assertion, and an award of attorney's fees to appellee is inappropriate in light of our holding. Their denial in the district court is also affirmed. *See Roth v. Pritikin,* 787 F.2d 54, 57 (2d Cir.1986) (award of attorney's fees lies within sound discretion of court); *Diamond v. Am-Law Publishing Corp.,* 745 F.2d 142, 148–49 (2d Cir.1984) (same).

### CONCLUSION

For the reasons stated, we hold that P–1 was an individually-authored, copyrightable, derivative work created by appellant and that Dr. Freeman's use cannot be said to be a fair use of it. Accordingly, we reverse the judgment of the district court and remand the case to it with directions that judgment be entered in favor of appellant Weissmann. The judgment otherwise appealed from is affirmed.

**REVERSED IN PART AND AFFIRMED IN PART.**

Circuit Judge PIERCE concurs in the result and files a separate opinion; Circuit Judge LUMBARD dissents in a separate opinion.

PIERCE, Circuit Judge, concurring:

I join in Parts II–V of the court's opinion. I join only in the result in Part I.

As to Part I, I agree that we must reverse and remand because Dr. Freeman failed to rebut appellant's claim (evidenced by her registration of P–1 as a derivative work) that she did *not* intend the new material to be "merged" with the prior joint work. *See generally* 1 M. Nimmer, *Nimmer on Copyright* § 6.03 (1988). Appellant's certificate of registration served as "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c) (1982). For Dr. Freeman to claim that his use was not an infringement, but rather that the work was "joint," was a defense much like any other under the Copyright Act. *See* 3 M. Nimmer, *supra,* § 13.04. Therefore, it was incumbent upon Dr. Freeman to rebut appellant's prima facie evidence that the work (P–1) was derivative, not joint. Appellee failed to meet his burden, however, for he failed to present sufficient evidence to demonstrate appellant's intent to create a joint work.

The district court appears to have applied the opposite presumption. Rather than focusing on the appellant's intent at the time of creating the derivative work, the court dwelt primarily on the parties' long-standing and close professional relationship. From that, it seems to have presumed that P–1—a by-product of that professional collaboration—was a "joint" work. That presumption, however, in effect placed the burden on the putative author to show that the work was derivative, rather than on the putative infringer to show that the work was joint. The district court's approach was therefore at odds with the statutory scheme of burdens of proof, and must be reversed as a matter of law.

I differ, though, with Judge Cardamone's reasoning in Part I. The fact that Dr. Freeman was not the author of any of the new material that went into P–1 did not, of itself, preclude that work from being "joint." Of course, as Judge Cardamone notes, one cannot be found to be a joint author of a work without actually having contributed to that work. *See* 1 M. Nimmer, *supra,* § 6.07. However, that does not mean that an author, to be a "joint" author, must have contributed to each incremental addition to the work. Thus, in this case, had Dr. Weissmann's intent been otherwise—had she intended the work to be joint—Dr. Freeman could have been deemed a joint author simply by virtue of his contributions to the earlier work, into which Dr. Weissmann's material would have been "merged." *See, e.g., Edward B. Marks Music Corp. v. Jerry Vogel Music Co.,* 140 F.2d 266, 267 (2d Cir.1944); 1 M. Nimmer, *supra,* § 6.03, at 6–7.

Further, I do not agree that the earlier incorporation of Dr. Freeman's "False Positives" study into the evolving syllabus was irrelevant. Though not dispositive, the parties' past willingness to have their works absorbed into the syllabus was relevant to the question of appellant's intent when she reshaped the syllabus into P–1.

On balance, however, I agree with the court that the evidence relied upon by appellee was not sufficient to show that appellant intended to create a joint work. Therefore, I join the conclusion of the court, and would reverse and remand, with judgment to be entered for appellant.

LUMBARD, Circuit Judge, dissenting:

I dissent, and vote to affirm the judgment of the district court in all respects, for the reasons stated in Judge Pollack's thorough and reasoned opinion. 684 F.Supp. 1248 (1988).